## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES WHEELER, Derivatively on Behalf of GRAPHIC PACKAGING HOLDING COMPANY,<br><br>             Plaintiff,<br><br>     v.<br><br>MICHAEL P. DOSS, STEPHEN R. SCHERGER, AZIZ AGHILI, LAURIE BRLAS, ANDREW P. CALLAHAN, ROBERT A. HAGEMANN, PHILIP R. MARTENS, ALESSANDRO MASELLI, ROBBERT E. RIETBROEK, JEFFREY M. STAFEIL, LARRY M. VENTURELLI, and LYNN A. WENTWORTH,<br><br>             Defendants,<br><br>      - and -<br><br>GRAPHIC PACKAGING HOLDING COMPANY,<br><br>             Nominal Defendant. | Civil Action No. _____<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff James Wheeler ("Plaintiff"), by the undersigned attorneys, brings this stockholder

derivative action on behalf of nominal defendant Graphic Packaging Holding Company ("Graphic

Packaging" or the "Company") against current and former members of the Graphic Packaging

Board of Directors (the "Board"), its former President and Chief Executive Officer ("CEO"), and

former Chief Financial Officer ("CFO") (the "Individual Defendants") for their breaches of

fiduciary duties and violations of the federal securities laws. Plaintiff alleges the following based

upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information

and belief, based upon the investigation of and analysis by Plaintiff's counsel, including, among

other things, a review of the Company's press releases and public filings with the United States

1

Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, a review of the securities fraud lawsuit filed against the Company and certain of its current and former officers and directors, *Thurber v. Graphic Packaging Holding Company, et al.*, No. 1:26-cv-03790-JAV (S.D.N.Y.) (the "Securities Class Action"), transcripts of the Company's conference calls with financial analysts and investors, published news reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a stockholder derivative action brought against certain current and former directors and officers for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to the Company and its stockholders.

2.      Graphic Packaging designs, produces, and sells consumer packaging products[1] internationally to businesses in the food, foodservice, beverage, household, and other consumer product industries.

3.      The Individual Defendants knew that the Company's financial performance and its ability to meet publicly disseminated 2025 financial guidance depended on the Company's ability to adjust inventory levels to align with deteriorating customer demand. Despite this knowledge, the Individual Defendants failed to oversee the Company's inventory management, a mission-

---

[1] Consumer packaging products are materials used to enclose, protect, and market everyday items. These are non-durable, everyday essentials that consumers use and replace frequently, such as food, beverages, cosmetics, and cleaning supplies.

critical function, and failed to implement and maintain adequate internal controls to ensure the Company was matching inventory to actual customer demand.

4. During fiscal year 2023, the Company's inventory levels rose materially above its historical norms. The primary cause was that Graphic Packaging's customers were drawing down their own inventories, a well-publicized "destocking" cycle that followed pandemic-era over-ordering. Customer demand declined 4% during this period.

5. Throughout 2023, the Individual Defendants represented that the inventory buildup was a customer-side issue, that it was short-term, and that the Company was actively managing supply to meet demand. Indeed, on the Company's second quarter 2023 earnings call, Defendant CEO Michael P. Doss ("Doss") represented that Graphic Packaging was "actively managing supply to meet demand in response to **short-term[2]** inventory destocking by retailers and our customers."

6. Contemporaneously, on February 7, 2023, the Company unveiled a multi-year capital investment program known as "Vision 2025", which encompassed the construction of a new recycled paperboard mill in Waco, Texas (the "Waco Mill"), and the closure of the Company's Augusta and East Angus paperboard manufacturing facilities. Critically, Vision 2025 was the largest capital investment program in the Company's history and its successful execution depended on aligning production at the Company's remaining facilities with customer demand throughout the transition—a challenge the Company claimed to address by intentionally building excess paperboard inventory to ensure customers would not experience supply disruptions.

7. However, by the end of fiscal year 2024, demand for the Company's consumer packaging products had further weakened across the Company's grocery, convenience, e-

---

[2] Emphasis is added unless otherwise noted herein.

commerce, and mass retail end markets, as inflation and consumer spending pressures reduced volumes throughout the Company's customer base.

8.      Despite this, the Individual Defendants failed to align the Company's inventory levels with weakening customer demand and allowed the dissemination of false and misleading statements representing that the Company was matching inventory to demand and was poised for sustainable growth in 2025, with the ability to meet its robust financial guidance for fiscal 2025 of Net Sales of approximately $8.6 billion to $8.8 billion, Adjusted EBITDA of approximately $1.66 billion to $1.76 billion, and Adjusted EPS of approximately $2.48 to $2.73.

9.      Specifically, throughout fiscal 2025, Defendant Doss and Defendant Stephen R. Scherger ("Scherger"), the Company's then-CFO, made repeated representations to investors, through earnings press releases, conference calls, and SEC filings, regarding the Company's ability to align its inventory levels with actual customer demand.

10.      For example, on February 4, 2025, in a Company press release reporting its Q4 and full year fiscal 2024 financial results, Defendant Doss portrayed the Company's inventory build-up as intentional, asserting that inventories had become depleted during and after the pandemic, and customers were increasing orders in order to restore their supply to normal level.

11.      Defendant Doss also represented that the Company required sufficient inventory to maintain high service levels in what he characterized as a "highly variable market," and that the inventory build was meant to protect customer deliveries and ensure on-time performance. In reality, the Company was facing worsening inventory management issues and weakening customer demand that were impacting its financials, material facts that the Company failed to disclose to investors.

12.    On May 1, 2025, the Company cut its full-year 2025 guidance to Net Sales of $8.2 billion to $8.5 billion, Adjusted EBITDA of $1.4 billion to $1.6 billion, and Adjusted EPS of $1.75 to $2.25, attributing the reduction to an expectation of a 2% volume decline and $80 million in input cost inflation. The Company's stock price fell by more than 15%. Despite this, Doss and Scherger continued to represent that the reduced demand and increased costs were "near-term" challenges and that the Company was working "aggressively" to match supply to demand for the remainder of the year.

13.    On July 29, 2025, the Company *raised* the low end of its full-year 2025 guidance, projecting Net Sales of at least $8.4 billion (up from $8.2 billion), Adjusted EBITDA of at least $1.45 billion (up from $1.4 billion), and Adjusted EPS of at least $1.90 (up from $1.75), citing "actual first half performance and a modest increase in second half revenue expectations."  On the same day, on an earnings call, Defendants Scherger and Doss represented that the Company was managing inventories "aggressively" and would return to normal inventory levels in the second half of 2025.

14.    On October 9, 2025, the Company disclosed that Defendant Scherger had resigned as the Company's Executive Vice President ("EVP") and CFO on October 6, 2025, effective November 7, 2025.

15.    On December 8, 2025, the Company announced that it would accelerate inventory reduction plans into the fourth quarter and materially reduced its full-year 2025 guidance again, lowering Adjusted EBITDA to a range of $1.38 billion to $1.43 billion (from $1.40 billion to $1.45 billion) and Adjusted EPS to a range of $1.75 to $1.95 (from $1.80 to $2.00). The Company also announced that Defendant Doss had initiated a transition process with the Board whereby Doss would depart from his position as CEO and as a director, effective December 31, 2025, and

that Defendant Robbert E. Rietbroek ("Rietbroek") had been appointed as the Company's new President and CEO, effective January 1, 2026.

16.    On February 3, 2026, the Company reported weak financial results for the fourth quarter and fiscal year ended December 31, 2025, just hitting the low end of the reduced 2025 guidance. The Company also issued full-year 2026 guidance of Net Sales of $8.4 billion to $8.6 billion, Adjusted EBITDA of only $1.05 billion to $1.25 billion, and Adjusted EPS of only $0.75 to $1.15 – reflecting a further deterioration from 2025 actuals and a substantial decline from the original February 2025 guidance of Adjusted EBITDA of $1.66 billion to $1.76 billion and Adjusted EPS of $2.48 to $2.73. CEO Rietbroek disclosed that inventory stood at approximately 20% of sales versus a 15–16% target, announced a $260 million inventory reduction plan carrying a $130 million EBITDA cost, and disclosed increased costs in connection with Vision 2025, including a $1.67 billion cost for the Waco Mill – 67% above the original $1 billion estimate. The stock fell nearly 16%, bringing the cumulative decline from pre-May 2025 levels to over 50%.

17.    While the Company's stock was inflated by the materially false and misleading statements alleged herein, Defendant Philip R. Martens ("Martens"), the Company's then-Chairman of the Board, sold 63,752 shares of Graphic Packaging common stock, reaping approximately $1,392,063 in illicit proceeds, while in possession of material, non-public information about the Company's rising inventory levels and inability to align inventory to customer demand.

18.    At the same time, the Board caused Graphic Packaging to repurchase 6,765,249 shares of its common stock at artificially inflated prices, at a total cost of approximately $150 million, during the misconduct period.

19.    On May 7, 2026, the Securities Class Action was filed in this Court against Graphic Packaging and Defendants Doss and Scherger, asserting claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all persons and entities that purchased or otherwise acquired Graphic Packaging securities between February 4, 2025 and February 2, 2026, inclusive. Graphic Packaging will incur substantial costs defending itself and its officers in the Securities Class Action, and any judgment or settlement will come directly from the Company's coffers to the extent not covered by its directors' and officers' liability insurance.

20.    Plaintiff did not make a demand on the Board to institute this action because, as set forth below, such a demand would be futile. The members of the Board are neither disinterested nor independent. Absent this action, Graphic Packaging will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.    JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a), and SEC Rules 10b-5 and 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and for contribution pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## III.    THE PARTIES

### A.    Plaintiff

24.    Plaintiff James Wheeler purchased Graphic Packaging stock in January 2025, has been at all relevant times, a stockholder of Graphic Packaging, and was a stockholder of the Company at the time of the transactions complained of herein. Plaintiff will adequately and fairly represent the interests of Graphic Packaging in enforcing and prosecuting its rights and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

### B.    Defendants

*Nominal Defendant Graphic Packaging Holding Company*

25.    Nominal Defendant Graphic Packaging Holding Company is a Delaware corporation with its principal executive offices located at 1500 Riveredge Parkway, Atlanta, Georgia 30328. Graphic Packaging's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GPK."

*Individual Defendants*

26.    Defendant Doss served as Graphic Packaging's President and CEO from January 1, 2016, until December 31, 2025, when he stepped down from each of these positions. Doss

8

served as a Graphic Packaging director from May 20, 2015 until December 31, 2025.  Doss is a named defendant in the Securities Class Action. In fiscal years 2025 and 2024, Doss received the following compensation from Graphic Packaging:

| YEAR | SALARY | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMP. | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|
| 2025 | $1,316,300 | $7,495,753 | N/A | $292,694 | **$9,104,747** |
| 2024 | $1,316,300 | $7,158,044 | $462,021 | $471,590 | **$9,407,955** |

27.    Defendant Scherger served as Graphic Packaging's EVP and CFO from January 2015 until November 7, 2025. Scherger is a named defendant in the Securities Class Action. In fiscal years 2025 and 2024, Scherger received the following compensation from Graphic Packaging:

| YEAR | SALARY | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMP. | ALL OTHER COMP. | TOTAL |
|---|---|---|---|---|---|
| 2025 | $676,883 | $2,054,480 | N/A | $100,389 | **$2,831,752** |
| 2024 | $775,000 | $1,881,456 | $171,275 | $209,616 | **$3,037,347** |

28.    Defendant Aziz Aghili ("Aghili") has served as a Graphic Packaging director since March 1, 2022. Aghili is a member of the Compensation and Management Development Committee and the Audit Committee. In fiscal years 2025 and 2024, Aghili received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $120,000 | $160,012 | **$280,012** |
| 2024 | $120,000 | $160,013 | **$280,013** |

29.    Defendant Laurie Brlas ("Brlas") has served as a Graphic Packaging director since January 11, 2019. Brlas is a member of the Audit Committee and the Nominating and Corporate Governance Committee. During the misconduct period, Brlas was also a member of the

Compensation and Management Development Committee. In fiscal years 2025 and 2024, Brlas received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $120,000 | $160,012 | **$280,012** |
| 2024 | $120,000 | $160,013 | **$280,013** |

30.    Defendant Andrew P. Callahan ("Callahan") has served as a director of Graphic Packaging since July 19, 2024. Callahan is the Chair of the Nominating and Corporate Governance Committee and a member of the Compensation and Management Development Committee. Callahan was a member of the Audit Committee during all or a substantial portion of the misconduct period. In fiscal years 2025 and 2024, Callahan received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $120,000 | $160,012 | **$280,012** |
| 2024 | $54,262 | N/A | **$54,262** |

31.    Defendant Robert A. Hagemann ("Hagemann") has served as a director of Graphic Packaging since May 21, 2014. Hagemann is Chair of the Audit Committee. Hagemann is a member of the Nominating and Corporate Governance Committee. In fiscal years 2025 and 2024, Hagemann received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $120,000 | $160,012 | **$280,012** |
| 2024 | $120,000 | $160,013 | **$280,013** |

32.    Defendant Martens served as a director of Graphic Packaging from November 21, 2013 until June 11, 2026, when he retired from the Board following the Company's Annual Meeting of Stockholders, and as Chairman of the Board from May 25, 2016, until he left the

10

Board. Martens was also the Chair of the Nominating and Corporate Governance Committee. During the misconduct period, Martens sold 63,752 Graphic Packaging shares for proceeds of approximately $1,392,063. In fiscal years 2025 and 2024, Martens received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|---|---|---|---|
| 2025 | $270,000 | $160,012 | **$430,012** |
| 2024 | $270,000 | $160,013 | **$430,013** |

33.    Defendant Alessandro Maselli ("Maselli") has served as a director of Graphic Packaging since May 21, 2025. Maselli is a member of the Compensation and Management Development Committee.

34.    Defendant Rietbroek has served as Graphic Packaging's President, CEO, and a director since January 1, 2026. In a Current Report on Form 8-K filed with the SEC on December 8, 2025, Graphic Packaging disclosed the following details of Rietbroek's compensation:

| SALARY/ YEAR | STOCK AWARDS | NON-EQUITY INCENTIVE PLAN COMP. | ONE-TIME GRANT OF RESTRICTED STOCK |
|---|---|---|---|
| $1,350,000 | Not less than 150% of base salary | Not less than 560% of base salary | $4,000,000 |

35.    Defendant Jeffrey M. Stafeil ("Stafeil") has served as a Graphic Packaging director since March 8, 2026. He is a member of the Audit Committee.

36.    Defendant Larry M. Venturelli ("Venturelli") has served as a Graphic Packaging director since May 25, 2016 and as Chairman of the Board since June 11, 2026. During the misconduct period, Venturelli served as Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee. In fiscal years 2025 and 2024, Venturelli received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|----------------------------|--------------|-------|
| 2025 | $145,000 | $160,012 | **$305,012** |
| 2024 | $145,000 | $160,013 | **$305,013** |

37. Defendant Lynn A. Wentworth ("Wentworth") has served as a Graphic Packaging director since November 18, 2009. Wentworth is the Chair of the Compensation and Management Development Committee and a member of the Nominating and Corporate Governance Committee. In fiscal years 2025 and 2024, Wentworth received the following compensation from Graphic Packaging:

| YEAR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
|------|----------------------------|--------------|-------|
| 2025 | $145,000 | $160,012 | **$305,012** |
| 2024 | $145,000 | $160,013 | **$305,013** |

38. Defendants Doss, Scherger, Aghili, Brlas, Callahan, Hagemann, Martens, Maselli, Rietbroek, Stafeil, Venturelli, and Wentworth are referred to collectively as the "Individual Defendants."

## IV.    INDIVIDUAL DEFENDANTS' DUTIES

39. By reason of their positions as officers or directors of Graphic Packaging and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Graphic Packaging and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Graphic Packaging in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Graphic Packaging and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

12

40.    Each director and officer of the Company owes a fiduciary duty to Graphic Packaging and its stockholders to exercise good faith and diligence in the administration of the affairs of the Company, including establishing and maintaining adequate financial controls and accurately and truthfully reporting the Company's financial condition and compliance with applicable laws.

41.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) exercise good faith and ensure that the Company's affairs were conducted in an efficient, business-like manner;

(b) exercise good faith and ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, and regulations;

(c) exercise good faith and ensure that the Company was not committing the misconduct alleged herein;

(d) ensure that the Company disclosed in its regulatory filings with the SEC all material facts so that the market price of the Company's stock would be based upon accurate information;

(e) exercise good faith in directing the business and affairs of the Company, including the consideration and payment of any distributions;

(f) refrain from unduly benefiting themselves and other Graphic Packaging insiders at the expense of the Company;

13

(g) not use their positions of control to engage in improper self-dealing or reap personal financial benefits at the expense of the Company; and

(h) exercise good faith to ensure that the Company's executive and director compensation was reasonable and not excessive.

42.     As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Graphic Packaging's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Graphic Packaging's management, policies, and internal controls.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and Graphic Packaging and were always acting within the course and scope of such agency.

44.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Graphic Packaging.

### A.     Duties Under Graphic Packaging's Code of Business Conduct and Ethics

45.     Graphic Packaging's Code of Business Conduct and Ethics (the "Code of Conduct") applies to all directors, officers, and employees of the Company. Among other things, the Code of Conduct requires that officers and directors act in accordance with the law and the Company's core values and policies; behave in a way that reflects positively on the Company; and speak up about ethical concerns and misconduct.

14

46.    The Code of Conduct further requires compliance with all applicable laws governing the Company's business and the Company's policies and the reporting of suspected misconduct:

> Following the law is non-negotiable. We comply with all applicable laws governing the work we do, and in some cases, go above and beyond. In cases where our policies are stricter than the law, follow the policy. Any time laws, local business practices, or customs conflict with our Code, do not try to resolve it on your own. Seek guidance from your manager, the Law Department, Human Resources, the Compliance Office, or our General Counsel.
>
> We create stronger teams and better workplaces when everyone feels empowered to raise concerns. If you witness, learn of, or even suspect misconduct, you have a responsibility to speak up. When you become aware of potential violations of our Code, inappropriate or unsafe conduct, or illegal behavior, let us know by alerting one of the following resources.
>
> You can report violations directly to Graphic Packaging's Law Department, which can offer guidance on issues including discrimination, harassment, human rights violations, corruption, conflicts of interest, trade laws, legal requirements or discrepancies, and other concerns.
>
> You can raise concerns about fraud, theft, bribery, or other accounting or auditing irregularities directly to our Global Compliance Office.

47.    The Code of Conduct requires an investigation of all reports of violations and misconduct:

> We take all reports of violations and misconduct seriously and have procedures in place to investigate every report promptly and thoroughly. You are expected to cooperate fully in any investigations. While we always seek to keep the information, you share as confidential as possible, there may be times when we must disclose some information as part of the investigation. If a violation of the Code, our policies, or the law is found to have occurred, we will take appropriate disciplinary action, up to and including dismissal. This includes violations stemming from malicious or dishonest reporting or attempts to obstruct or mislead investigators. Certain violations may also result in legal action, penalties, or criminal prosecution.

48.    The Code of Conduct obligates all officers and directors to comply with insider trading laws:

In the course of your work, you may gain specific knowledge about Graphic Packaging and the companies we work with that would give you an unfair advantage when dealing in stocks and other securities. This knowledge is known as material, nonpublic information (MNPI), and using it to buy, sell, or gift stocks constitutes insider trading. Insider trading is a breach of trust and against the law. All employees and Company directors must abide by applicable insider trading law.

**B.      Duties Under Graphic Packaging's Corporate Governance Guidelines**

49.      Graphic Packaging's Corporate Governance Guidelines ("Governance Guidelines") requires the Board to, among other things, ensure "processes are in place for maintaining the integrity of the Company in financial reporting and legal and ethical compliance matters, and in relationships with customers, suppliers, employees, the community and stockholders."

50.      Under the Governance Guidelines, the directors are responsible for acting in the Company's best interest: "Each Director shall act in good faith and exercise his or her duty of care in a manner that he or she believes to be in the best interest of the Company and its stockholders."

**C.      Additional Duties Of Nominating And Corporate Governance Committee Members**

51.      Graphic Packaging's Nominating and Corporate Governance Committee Charter (the "Corporate Governance Charter") provides that the purpose of the Nominating and Corporate Governance Committee is to, among other things, develop and recommend to the Board a set of corporate governance principles applicable to the Company.

52.      Under the Corporate Governance Charter, the Nominating and Corporate Governance Committee is also responsible for overseeing the Board's annual performance:

The Committee shall undertake and review an annual performance evaluation of the Board. The Committee shall conduct such performance evaluation in such manner as the Committee deems appropriate; and may report the results of its performance evaluation through an oral report by the chairperson of the Committee or any other member of the Committee designated by the Committee to make this

16

report. In addition, the Committee shall conduct an annual review of director experience and skills to better inform the Board as to any areas which need to be addressed either through training or board recruitment.

**D.      Additional Duties Of Audit Committee Members**

53.     Graphic Packaging's Audit Committee Charter, last revised November 19, 2020, provides that the Audit Committee is responsible, among other things, to assist the Board in overseeing: (i) the quality and integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; and (iii) the Company's guidelines and policies with respect to risk assessment and risk management.

54.     The Audit Committee also has duties to:

- Review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any significant issues as to the adequacy of the Company's internal controls.

- Review and discuss with management and the independent auditors management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act.

- Review earnings press releases and discuss with management the Company's practices regarding such press releases and the provision of financial information and earnings guidance by management to analysts and rating agencies.

- Review and discuss with the CEO and CFO the procedures undertaken in connection with the CEO and CFO certifications for Forms 10-K and 10-Q, including their evaluation of the Company's disclosure controls and procedures and internal control over financial reporting.

- Establish and maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters.

- Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Corporation's financial statements or accounting policies.

- Periodically review and discuss with management the Corporation's guidelines and policies with respect to the process by which the Corporation undertakes risk assessment and risk management, including discussion of the Corporation's significant risk exposures.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

55. Graphic Packaging sells its consumer packaging products through sales offices, as well as through broker arrangements with third parties. The Company derives substantially all of its revenues from the sale of paperboard packaging to its consumer-products customers, making the alignment of inventory to customer demand through appropriate production levels mission-critical to the Company's operational and financial performance.

56. During fiscal 2023, even as the Company's organic sales declined 4%, the Company's finished goods inventory rose 17% — from $515 million at December 31, 2022, to $602 million at December 31, 2023. Total net inventories rose $148 million year-over-year, to $1.754 billion, as reported on the Company's Consolidated Balance Sheet included in the 2023 Annual Report on Form 10-K filed with the SEC on February 21, 2024. Thus, the Company's inventory was rising at the very time its customers were ordering less product.

57. Throughout 2023, Defendant Doss attributed the Company's volume declines to "short-term inventory destocking by retailers and our customers" and represented that the Company was "actively managing supply to meet demand." On the Company's Q2 2023 earnings conference call on August 1, 2023, Defendant Scherger told investors that the destocking was "relatively short term" and that the Company expected "to return to organic sales growth during the fourth quarter." On the Company's Q3 2023 earnings conference call on November 1, 2023, Defendant Doss stated that "we view destocking as largely in our rearview mirror now."

18

58.     In February 2023, the Company announced the Vision 2025 capital investment program, including the construction of the Waco Mill at an estimated cost of approximately \$1 billion, to be funded from operating cash flow over three years. The Waco Mill was designed to replace capacity from three older facilities slated for closure, in Middletown, Ohio; East Angus, Quebec; and Tama, Iowa, consolidating the Company's North American recycled paperboard network from eight mills to six while modestly increasing total capacity.[3] The successful execution of Vision 2025 and the Company's ability to realize its financial benefits depended on aligning production at the Company's remaining facilities with actual customer demand throughout the multi-year transition.

59.     The Company's inventory continued to rise throughout 2023. The quarterly and annual financial statements reviewed by the Audit Committee reflected this growing imbalance. The rising inventory in the face of declining customer demand was a red flag that the Individual Defendants failed to investigate, and the Individual Defendants failed to take action to ensure that the Company's production was brought into alignment with declining customer demand. Instead, the Individual Defendants permitted the Company to continue operating without adequate internal controls over inventory management while the Company was executing the largest capital investment program in its history—a period in which the risks of production-demand misalignment were at their highest.

**B.      The Board's Failure To Oversee The Company's Inventory Management**

60.     On February 4, 2025, the Company filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing its financial results for the fourth quarter and fiscal year ended December 31, 2024, and the Company's full-year 2025 financial guidance. The 2025

---

[3] In February 2024, the Company unveiled "Vision 2030" at its Investor Day, establishing long-term financial targets premised on the successful completion of the Vision 2025 asset investments.

financial guidance included (i) revenue of about $8.6–$8.8 billion; (ii) Adjusted EBITDA of about $1.66–$1.76 billion; and (iii) Adjusted Earnings per Share ("EPS") of about $2.48–$2.73 per share.

61.    In the press release, Defendant Doss discussed the "volume challenges" facing the Company's industry and customers but represented that the Company was adequately responding to its customers' "evolving needs":

> The past two years have presented unusual volume challenges for the industry and our customers. Customer destocking is largely over, but consumers are stretched and searching for value in their everyday purchases. Across grocery, convenience, e-commerce and mass retail, Graphic Packaging is responding to our customers' evolving needs by creating the more circular, more functional, and more convenient packaging that consumers prefer. As the last of our major asset investments comes to completion in 2025, capital spending will decline significantly, and we will deploy excess cash to create substantial value for our stockholders.

62.    The same February 4, 2025 press release further quoted Defendant Doss as portraying the Company's 2024 results as evidence of a sustainable and durable business model, and as the foundation for continued performance in fiscal 2025:

> In 2024, we demonstrated the value of the Graphic Packaging business model, generating a level of consistency and profitability in line with other leading consumer packaging companies. We delivered strong and steady margins and significant new consumer packaging innovations. Our strategic investments in capabilities, innovation, and competitive advantage have positioned the company for long-term value creation. In 2025, we will build on that success, driving competitive advantage in recycled paperboard across all of North America, and expanding our innovation capabilities into new markets and new product categories around the world.

63.    The same day, Graphic Packaging hosted a conference call with investors and analysts to discuss its financial results for fiscal year 2024.

64.    Defendant Doss represented the Company's 2024 performance reflected a fundamentally sound business model capable of delivering consistent results regardless of market conditions:

In 2024, we demonstrated the strength of our business model, delivering strong and steady margins and challenging market conditions. We are well-positioned for 2025 and to meet our Vision 30 aspirations in the years ahead.

*\*\*\**

When I became CEO back in 2016, our business which was about half the size, far less balanced than it is today, wasn't capable of generating the consistency that we now deliver. Our team has done an outstanding job executing at a high level to build a consumer packaging business capable of generating strong and steady margins and cash flows across a variety of market environments.

65.    Defendant Scherger represented that despite "a broad-based customer and retailer destocking and consumers under pressure from inflation, both of which reduced [the Company's] volumes," Graphic Packaging was "generating appropriate value" for its packaging which was "translating into strong and steady margins." Defendant Scherger further represented that "[g]iven the volume challenges our customers are facing, the bottom of our 2025 adjusted EBITDA range assumes the year not very different from the one we just ended. Even at that level, margins would be in the 19% range, which again speaks to the strength of the business model."

66.    When an analyst asked Defendants about whether the Company's rising inventory level was "intentional," Defendant Doss represented that the Company was matching inventory to demand:

> [I]n some cases, we did have inventories that were a bit depleted coming out of the rush through the pandemic, if you will. And so our customers wanted us to get those back to the traffic levels, which we've done.
>
> The biggest impact on a year-over-year basis to give some of the planning we're already doing to get ready for the Waco start up as you can appreciate, we've got a couple of paperboard manufacturing facilities that we need to take down and what we need to start up. So, we have to make sure we protect our customers during that process.
>
> You'll see that wash through pretty quickly as Waco comes online, we expect to harvest that working capital. ***It's something we've got an [eye on], we want to normalize our paperboard and the levels that we have.*** But when you're going through a startup like that, you've got to make sure that you cover for some of the contingencies, that's what we're doing.

21

67.    In response to another analyst question regarding whether the Company's "inventories are balanced where you want to be," Defendant Doss again represented that the Company's elevated inventory levels were intentional and would normalize once the Waco Mill came online:

As I mentioned, we made a decision to build a little bit of paperboard inventory here as we prepare for start of Waco paperboard mill, but as I mentioned earlier in my comments, that will wash [through] pretty quickly as we bring that mill up and running.

So, by and large, we like where we're at with our finished goods. [I]t's a balance to make sure that we're able to respond to customer needs in a highly variable market.

68.    On February 12, 2025, Graphic Packaging filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 10-K"), with the SEC. The 2024 10-K was signed by Defendants Doss, Scherger, Martens, Aghili, Brlas, Callahan, Hagemann, Venturelli, and Wentworth.

69.    The 2024 10-K represented that the Company was successfully aligning its operations with customer needs and demand:

Graphic Packaging works closely with its customers to understand their needs. . . . The Company's approach serves to build and strengthen long-term relationships with purchasing, brand management, marketing, and other key customer functions. The Company is organized to bring the full resources of its global and local . . . manufacturing capabilities to all of its customers with the goal of delivering packaging solutions that are more circular, more functional, and more convenient.

70.    Defendants Doss and Scherger signed SOX certifications appended as exhibits to the 2024 10-K representing that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of

operations and cash flows of the [Company] as of, and for, the periods presented in this report." These certifications were false.

71.     In reality, the Company's elevated inventory levels were not the product of deliberate, customer-protective planning, as Defendants Doss and Scherger represented, but instead reflected the Individual Defendants' failure to align the Company's production with deteriorating customer demand. These representations of an intentional inventory build and durable margins were inconsistent with what the Board knew, or recklessly disregarded, about the Company's worsening production-demand misalignment. Despite this knowledge, the Individual Defendants failed to take action to ensure that the Company's mission-critical inventory management function could support its publicly disseminated fiscal 2025 guidance and instead permitted the Company to reaffirm that guidance while the misalignment compounded.

72.     On May 1, 2025, Graphic Packaging filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing, among other things, financial results for the first quarter of 2025, including non-GAAP EPS of $0.51, missing consensus estimates by $0.07, and revenue of $2.12 billion, representing a 6.2% year-over-year decline and missing consensus estimates by approximately $10 million.

73.     In the same press release, the Company materially reduced its full-year 2025 financial guidance, lowering Net Sales to a range of $8.2 billion to $8.5 billion (from $8.6 billion to $8.8 billion), Adjusted EBITDA to a range of $1.4 billion to $1.6 billion (from $1.66 billion to $1.76 billion), and Adjusted EPS to a range of $1.75 to $2.25 (from $2.48 to $2.73). The Company attributed the negatively revised guidance to "an expectation of a 2% volume decline and $80 million of input cost inflation at the midpoint," as well as "higher macroeconomic and consumer spending uncertainty."

74.     Following the disclosure of the reduced guidance and disappointing first quarter financial results, Graphic Packaging's stock price fell $3.94 per share, or 15.57%, to close at $21.37 per share on May 1, 2025 – its largest intraday decline since October 2018.

75.     Notwithstanding the partial disclosure of the Company's inventory management and demand-deterioration issues, the Individual Defendants failed to take action to correct the Company's production-demand misalignment and instead permitted Defendants Doss and Scherger to continue to represent that the Company's margins were durable and that the Company was aligning its production with customer demand.

76.     Indeed, in the press release, Defendant Doss represented that the Company was continuing to "gain market position" as it "partner[ed] with customers in a rapidly changing market":

> We saw a small volume decline in the Americas business, but continued improvement in our International business. Leveraging our growing cost and quality advantage and the strength of our innovation portfolio, ***we continue to gain market position as we partner with customers in a rapidly changing market.***
>
> We saw an uptick in input cost inflation during the quarter, and responded with a price increase intended to bring margins back to a more normal range. With our Waco, Texas recycled paperboard investment nearing completion, our capital spending needs decline substantially. We expect to return substantial cash to stockholders in the months and years ahead through a growing dividend and share repurchase.

77.     On the same day, the Company held a conference call with financial analysts and investors to discuss the Company's Q1 2025 results, in which Defendant Doss represented that the challenges facing the Company were "near-term" in nature and that the Company remained "well-positioned to generate substantial cash flow in the quarters and years ahead." Specifically, Defendant Doss stated that the Company had "taken actions to offset higher costs and continue to generate innovation sales growth that is helping us grow faster than the end markets we serve."

24

78.     During the May 1, 2025 conference call, in response to analyst questions regarding the Company's inventory management practices, Defendant Doss represented that the Company was able to actively match its production to customer demand and reduce inventory accordingly:

> [A]s we look at [fiscal year 2025] and how we want to operate the business, while we can't control our volumes, what we can control is our cash flow. And we want to run our business really to demand and making sure that we're running to the requirements that we see in front of us.
>
> That'll eliminate some of the inventory.

79.     Defendant Scherger reiterated this representation, repeatedly emphasizing that the Company would match supply to demand for the remainder of fiscal year 2025. Specifically, Defendant Scherger represented that "we're going to run to demand this year," that "[w]e'll be matching supply and demand," and that "[w]e will be taking inventory out of the business" and "aggressively matching supply and demand for the remainder of the year[.]"

80.     Also on May 1, 2025, Graphic Packaging filed its Quarterly Report on Form 10-Q for the first quarter of fiscal year 2025 (the "Q1 2025 10-Q") with the SEC. The Q1 2025 10-Q repeated the representation that Graphic Packaging "works closely with its customers to understand their needs" and that the Company was "organized to bring the full resources of its global and local . . . manufacturing capabilities to all of its customers."

81.     Defendants Doss and Scherger signed SOX certifications appended as exhibits to the Q1 2025 10-Q representing that the Q1 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of

25

operations and cash flows of the [Company] as of, and for, the periods presented in this report." These certifications were false.

82.    On July 29, 2025, Graphic Packaging filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing, among other things, the Company's financial results for the second quarter of 2025. The press release announced that the Company had *raised* the lower end of its full-year 2025 financial guidance, projecting Net Sales of at least $8.4 billion (up from at least $8.2 billion), Adjusted EBITDA of at least $1.45 billion (up from at least $1.4 billion), and Adjusted EPS of at least $1.90 (up from at least $1.75). The Company cited "actual first half performance and a modest increase in second half revenue expectations" for the raised guidance.

83.    In the press release, Defendant Doss touted the Company's work to align with customer needs: "Promotional activity drove modestly better than expected volumes in [Q2]. Conversations with our customers suggest potential for increased emphasis on volume growth and protecting share in the year ahead. As these customers refine their strategies, we are working closely with them to support their plans."

84.    The same day, the Company held a conference call with financial analysts and investors to discuss its Q2 2025 results, in which Defendant Doss represented that the Company was headed toward normal inventory levels in the second half of the year: "Our decision to curtail production to further reduce inventory levels positions us to operate much closer to normal levels in the second half."

85.    Defendant Scherger confirmed this notion:

> [Q2] is our biggest maintenance quarter, and we took aggressive action to manage inventories, which positions us to run at more normal levels in the second half.

***

26

[W]e expect second half adjusted EBITDA margins to be meaningfully better than first half as a result of actions we have taken to reduce inventories.

86.     During the Q&A portion of the call, Defendant Scherger made specific quantitative representations regarding the Company's inventory reduction progress, claiming that the Company had removed 50,000 tons of inventory in the first half and that additional reductions would follow naturally:

Q2 was very high for planned maintenance and less market-related downtime as we took over 50,000 tons of inventory out of the company in the first half that doesn't need to be repeated in the second half. So 2 major components to the $100 million price and performance being $25 million and $60 million cumulatively. The remaining $15 million is a cross-section of some other inflation FX items, so relatively modest.

*** 

[W]e're very pleased with our inventory reduction efforts through -- from December here through June. There'll be more inventory coming out of the company naturally in the second half of the year, but the economic impact of that is relatively modest as we sell aggressively out of inventory.

87.     In response to an analyst's question regarding whether the Company's customers had built comfortable inventory positions heading into the second half of 2025, Defendant Doss represented that customer demand for Graphic Packaging's products remained strong:

[O]ur volume [is] obviously quite good this year. . . . I can tell you we're busy. We're steady. The demand is strong. We've gotten no indications from them that it's going to back off before the normal occurrence[.]

88.     Also on July 29, 2025, Graphic Packaging filed its Quarterly Report on Form 10-Q for the second quarter of fiscal year 2025 (the "Q2 2025 10-Q") with the SEC. The Q2 2025 10-Q repeated the representation that Graphic Packaging "works closely with its customers to understand their needs" and that the Company was "organized to bring the full resources of its global and local . . . manufacturing capabilities to all of its customers."

27

89. Defendants Doss and Scherger signed SOX certifications appended as exhibits to the Q2 2025 10-Q representing that the Q2 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report." These certifications were false.

90. In reality, the Company's inventory remained materially misaligned with customer demand—as the Company would later disclose, inventory stood at approximately 20% of sales against a 15–16% target—and the represented return to normal inventory levels in the second half of 2025 was inconsistent with what the Board knew, or recklessly disregarded, about the underlying production-demand misalignment. Despite this knowledge, the Individual Defendants failed to take action to align the Company's production with customer demand and instead permitted the Company to raise its full-year 2025 guidance.

91. Close on the heels of these representations, on August 1 and 4, 2025, Defendant Martens sold 63,752 shares of Graphic Packaging common stock for approximately $1,392,063 in proceeds at prices ranging from $21.80 to $21.84 per share. The full schedule of Defendant Martens' sales is set forth below.

C.    **The Company Discloses The Resignations Of Its CEO And CFO**

92. On October 9, 2025, Graphic Packaging filed a Current Report on Form 8-K with the SEC disclosing that Defendant Scherger had resigned as the Company's EVP and CFO on October 6, 2025, effective as of November 7, 2025, "to allow Mr. Scherger to close out third quarter reporting and ensure a smooth transition."

28

93. Defendant Scherger's resignation came just over two months after he had represented to investors during the July 29, 2025 conference call that the Company "took aggressive action to manage inventories" and that the Company's actions "position[ed] us to run at more normal levels in the second half," and after he had signed false SOX certifications appended to the Company's Q1 2025 10-Q and Q2 2025 10-Q.

94. On November 4, 2025, Graphic Packaging filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing, among other things, the Company's financial results for the third quarter of 2025, including Net Sales of $2.19 billion (down 1% year-over-year), Net Income of $142 million, or $0.48 per diluted share (compared to $0.64 per diluted share in the prior-year period), and Adjusted EBITDA of $383 million (down 13% from $433 million in the prior-year period), reflecting an Adjusted EBITDA Margin of 17.5% (compared to 19.5% in the prior-year period). The Company also again reduced its full-year 2025 guidance, lowering Adjusted EBITDA to a range of $1.40 billion to $1.45 billion (from at least $1.45 billion), and Adjusted EPS to a range of $1.80 to $2.00 (from at least $1.90), citing "year-to-date performance, further action to match production to orders (~$15 million), and a wider than normal range of potential fourth quarter outcomes." In the press release, Defendant Doss touted the Company's growth despite "sluggish consumer volumes": "Against a backdrop of sluggish consumer volumes, we executed well in the quarter, reduced inventory, and saw our innovation engine open new markets for paperboard packaging. As food affordability challenges ease, the full power of our business model and its cash generating potential will become even more apparent."

95. The November 4, 2025 press release confirmed the Company's updated full-year 2025 financial guidance:

> The Company currently expects full-year 2025 Net Sales, Adjusted EBITDA, and Adjusted EPS, including foreign exchange impact, of $8.4 billion to $8.6 billion,

$1.40 billion to $1.45 billion, and $1.80 to $2.00, respectively. Revisions from prior guidance reflect year-to-date performance, further action to match production to orders (~$15 million), and a wider than normal range of potential fourth quarter outcomes.

96.    During the November 4, 2025 conference call to discuss the financial results, in response to an analyst question regarding the Company's ability to manage productivity and cost, Defendant Doss represented that the Company had the operational tools and oversight necessary to align supply with demand:

> [W]e have a unique perspective to be able to look at our overall system, look at our supply chains, take a step back and really make sure that we're challenging kind of where we're at and what we can do . . . [these] are the levers that we really have in our control.

97.    Defendant Doss further represented, with respect to the Company's ability to "manage our supply and demand on our coated recycled paperboard," that "[w]e're able to do that and we're able to do it cost effectively."

98.    Defendant Doss also represented that the Company would "continue to drive inventory out of our system" and that the Company's decisions to curtail production were "intended to protect our margin profile and to protect our volume." Doss further stated that "we are focused on protecting our industry-leading margins and protecting share where we are the best and most logical supplier in the medium and long term," and that the Company was "using this period of unusual competitive behavior to align our order books with customers who understand the durable competitive advantages that we have in innovation, cost, efficiency and quality."

99.    Also on November 4, 2025, Graphic Packaging filed its Quarterly Report on Form 10-Q for the third quarter of fiscal year 2025 (the "Q3 2025 10-Q") with the SEC. The Q3 2025 10-Q repeated the representation that Graphic Packaging "works closely with its customers to understand their needs" and that the Company was "organized to bring the full resources of its global and local . . . manufacturing capabilities to all of its customers."

100.    Defendants Doss and Scherger signed SOX certifications appended as exhibits to the Q3 2025 10-Q representing that the Q3 2025 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report." These certifications were false.

101.    On December 8, 2025, after the close of trading, Graphic Packaging filed a Current Report on Form 8-K with the SEC, attaching a press release disclosing that the Company would accelerate inventory reduction plans into the fourth quarter that had been originally planned for 2026:

> [T]he Company plans to accelerate certain inventory reduction plans into [Q4] that were originally planned for 2026. Production curtailment is expected to impact [Q4] operating results by $15 million, which is in addition to the $15 million relating to curtailments announced during [Q3] earnings call.

102.    In the same December 8, 2025, press release, the Company cut its full-year 2025 financial guidance, despite raising the guidance a few months earlier. Adjusted EBITDA was now expected to be "in the range of $1.38 billion to $1.43 billion (from $1.40 billion to $1.45 billion)," and Adjusted EPS was now expected to be "in the range of $1.75 to $1.95 (from $1.80 to $2.00)."

103.    The same day, the Company issued a separate press release announcing that Defendant Doss "has mutually agreed with the Graphic Packaging Board of Directors to step down from his role and as a director effective December 31, 2025" and the appointment of Defendant Rietbroek as the Company's new President and CEO and as a director, effective January 1, 2026.

104.    The market reacted swiftly to the December 8, 2025 disclosures. On the following day, Graphic Packaging's stock price fell by more than 8% or $1.35 per share, to close at $14.23 per share—the largest single-day decline in seven months—with trading volume spiking to more than seventeen times the 20-day average for that time of day.

**D.    The Full Scope Of The Inventory Management Issues Is Revealed**

105.    On February 3, 2026, Graphic Packaging filed a Current Report on Form 8-K with the SEC, attaching a press release reporting the Company's financial results for the fourth quarter and fiscal year ended December 31, 2025, including Q4 non-GAAP EPS of $0.29, missing consensus estimates by $0.06. The Company attributed its disappointing Q4 2025 earnings results to, among other things, lower volumes, increased costs, and inventory reduction:

> [Q4] EBITDA decreased 19% to $305 million, versus $376 million in the same quarter last year. Excluding the impact of business combinations and other non-recurring and special items, Adjusted EBITDA was $311 million versus $404 million in the same quarter last year. The $93 million decline in Adjusted EBITDA was driven primarily by the impact of lower packaging price and volume, commodity and non-commodity costs, and negative Net Performance as a result of decisions taken to curtail production to reduce inventory.

106.    The press release reported weak full-year 2025 financial results:

> Net Income for full-year 2025 was $444 million, or $1.48 per diluted share, versus $658 million, or $2.16 per diluted share for full-year 2024. Full-year 2025 and 2024 Net Income were impacted by a net charge from non-recurring and special items and amortization of purchased intangibles of $95 million and $101 million, respectively. Excluding non-recurring and special items and amortization of purchased intangibles, Adjusted Net Income for full-year 2025 was $539 million, or $1.80 per diluted share, and $759 million, or $2.49 per diluted share for full-year 2024.

107.    The February 3, 2026 press release further disclosed that the Company projected a meaningful decline in Adjusted EBITDA in 2026 to a range of $1.05 billion to $1.25 billion:

> The Company currently expects adjusted EBITDA of $1.05 billion to $1.25 billion. The decline in expected Adjusted EBITDA reflects a $130 million negative impact from actions taken to reduce inventory and generate [FCF], an approximately $100 million accrual (non-cash in 2026) for a return to more normal incentive

compensation, January weather and production impacts, and other largely offsetting operating items.

108. In the same press release, the Company's new President and CEO, Defendant Rietbroek, announced that he had "initiated a comprehensive review of [the Company's] organization structure, operations, and footprint."

109. Following these disclosures, Graphic Packaging's stock price fell $2.36 per share, or 15.97%, to close at $12.42 per share on February 3, 2026.

110. In all, Graphic Packaging's stock price declined from $25.31 per share before the May 1, 2025 disclosure to $12.42 per share on February 3, 2026—a cumulative decline exceeding 50%.

### E.    Graphic Packaging's False And Misleading Proxy Statement

111. On April 7, 2025, Graphic Packaging filed its Proxy Statement with the SEC (the "2025 Proxy") and solicited stockholder votes to, among other things, elect Defendants Brlas, Hagemann, and Maselli to the Board and to approve executive compensation. The 2025 Proxy was authorized by the Board and signed by Defendant Doss.

112. The 2025 Proxy represented that the Board was overseeing the material risks facing the Company, including the operational and financial-reporting risks at the core of the Company's business:

> As set forth in the Company's Corporate Governance Guidelines, the Board is responsible for reviewing, approving and monitoring business strategies and financial performance, and ensuring processes are in place for maintaining the integrity of the Company in financial reporting, legal and ethical compliance matters, and in relationships with customers, suppliers, employees, the community and stockholders.

113. The 2025 Proxy represented that the Audit Committee was engaged in vigorous oversight:

The Audit Committee has oversight responsibility for the quality and integrity of the Company's financial statements, the performance of the Company's internal audit function and the Company's compliance with legal and regulatory requirements. The Committee also periodically reviews and evaluates the Company's policies with respect to risk assessment and risk management, including discussion of the Company's major financial risk exposures and the steps that management has taken to monitor and control such exposures.

[T]he Audit Committee reviews each of the Company's Annual Report on Form 10-K and its Quarterly Reports on Form 10-Q and has the opportunity to discuss such reports with management of the Company and the Company's independent auditors prior to the filing of such reports with the SEC.

114. The 2025 Proxy represented that the Nominating and Corporate Governance Committee is responsible for, among other things, "developing and recommending a set of corporate governance principles to the Board."

115. The 2025 Proxy further represented that "the Compensation and Management Development Committee reviews and approves the Company's general compensation philosophy, incentive and equity compensation plans, health and welfare plan offerings and retirement plans for all employees to ensure that they do not encourage unnecessary or excessive risk-taking." The 2025 Proxy represented that "the Compensation and Management Development Committee and the Board has visibility into and exercises oversight over the financial and other risks."

116. The 2025 Proxy further represented that the Board oversaw "areas of particular risk through its Audit Committee, Compensation and Management Development Committee and Nominating and Corporate Governance Committee, each of which provides a report to the full Board of Directors at each regular Board meeting," and that "each of the standing committees of the Board reviews and evaluates specific financial, operational and reputational risks that could affect the Company's ability to meet its financial and sustainability goals."

117. The foregoing statements in the 2025 Proxy were materially false and misleading and omitted material information. Contrary to the representations in the 2025 Proxy, the Board

34

was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy contained materially false and misleading statements concerning the Board and its Committees' oversight over risks to the Company, the Company's corporate governance, and compensation programs.

118.   On May 22, 2025, the Company filed with the SEC a Current Report on Form 8-K announcing, among other things, the election of Defendants Brlas, Hagemann, and Maselli and the approval of executive compensation, pursuant to the solicitations in the 2025 Proxy.

**F.      Graphic Packaging Is Sued In The Securities Class Action**

119.   As a result of the Individual Defendants' misconduct, Graphic Packaging has been named as a defendant in the Securities Class Action. The Securities Class Action alleges that the Company, and Defendants Doss and Scherger violated Section 10(b) of the Exchange Act by making materially false and misleading statements regarding the strength and sustainability of Graphic Packaging's business model, the Company's ability to manage inventory effectively, during the period from February 4, 2025 through February 2, 2026, and that the named officer defendants violated Section 20(a) of the Exchange Act.

### G.    Insider Trading By Defendant Martens

120.    While false and misleading statements and material omissions regarding Graphic Packaging's inventory management, the alignment of the Company's production with customer demand, and the Company's financial condition inflated the Company's stock, Defendant Martens sold 63,752 shares of Graphic Packaging common stock, reaping approximately $1,392,063 in illicit proceeds, as depicted in the chart below. Martens' sales were executed while Martens was in possession of material, non-public information about the Company's inadequate controls over inventory management and worsening inventory issues.

| Transaction Date | Shares Sold | Avg. Price/Share | Total Proceeds |
|---|---|---|---|
| Aug 1, 2025 | 56,737 | $21.84 | $1,239,136 |
| Aug 4, 2025 | 7,015 | $21.80 | $152,927 |
| Total | 63,752 | $21.84 | $1,392,063 |

### H.    The Company Purchases Over Six Million Shares At Inflated Prices Based On The Individual Defendants' Misrepresentations

121.    While the Individual Defendants were engaging in the misconduct alleged herein, the Board authorized and the Company executed share repurchases at artificially inflated prices. Thus, the Individual Defendants breached their fiduciary duties by forcing Graphic Packaging to buy back its own stock at artificially inflated prices, based on the misrepresentations outlined in this complaint.

122.    The bulk of the repurchases—approximately $112 million for 4,982,296 shares—occurred in the second quarter of 2025 under the $1.5 billion repurchase program the Board authorized on April 30, 2025, at prices that remained artificially inflated because the full scope of the Company's production-demand misalignment was not disclosed until December 8, 2025 and February 3, 2026. The Company repurchased an additional 1,782,953 shares in the third

quarter of 2025 at prices still inflated by the false and misleading statements alleged herein, including the July 29, 2025 guidance raise.

123.    During the misconduct period, the Individual Defendants caused Graphic Packaging to repurchase 6,765,249 shares of its common stock in the open market for approximately $150 million at prices artificially inflated by the false and misleading statements alleged herein, as follows:

| Period | Shares Repurchased | Avg. Price/Share | Total Cost |
|---|---|---|---|
| Q2 2025 (Apr-Jun) | 4,982,296 | $22.28 | $111,000,000 |
| Q3 2025 (Jul-Sep) | 1,782,953 | $21.87 | $39,000,000 |
| **Total** | **6,765,249** | | **$150,000,000** |

### I.    Damage To Graphic Packaging

124.    As a result of the Individual Defendants' breaches of fiduciary duty, Graphic Packaging has suffered and will continue to suffer significant harm, including but not limited to: (a) exposure to liability in the Securities Class Action; (b) approximately $150 million in losses from share repurchases at inflated prices; (c) nearly $1.4 million in insider trading proceeds that should be disgorged to the Company; (d)  the payment of incentive compensation to Defendants Doss and Scherger during the misconduct period, the basis for which (*i.e.*, the Company's reported financial results and short-term financial targets) was materially false and misleading; and (e) costs of remediation and internal investigation.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.    Plaintiff brings this action derivatively and for the benefit of Graphic Packaging to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Graphic Packaging and violations of Sections 10(b) and 14(a) of the Exchange Act, and SEC Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5

37

& 240.14a-9) promulgated thereunder, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof.

126. Graphic Packaging is named solely as a nominal party in this action.

127. Plaintiff is, and has been at all relevant times, a stockholder of Graphic Packaging and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of Graphic Packaging in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

128. Plaintiff has not made a demand on the Board to institute this action because such demand would be futile. At the time this action was filed, the Board consisted of nine directors: Defendants Aghili, Brlas, Callahan, Hagemann, Maselli, Rietbroek, Stafeil, Venturelli (Chairman), and Wentworth. The Board is neither disinterested nor independent.

### A. Demand Upon Defendant Aghili Is Excused

129. Aghili has a longstanding business relationship with Defendant Martens. Before joining the Graphic Packaging Board, Aghili spent approximately twenty years at ArvinMeritor, Inc. (now Meritor, Inc.), where he held leadership positions in the Light Vehicle Systems division, including Vice President of Global Procurement for Light Vehicle Systems and Vice President of Commercial Marketing and Business Development for Light Vehicle Systems Asia/Pacific. During the same period, Defendant Martens served as Senior Vice President of Light Vehicle Systems at ArvinMeritor — the same division in which Aghili held leadership roles. Martens and Aghili overlapped at ArvinMeritor for approximately three years (2006–2009).

130. Further, Martens, as Chairman of the Board and Chair of the Nominating and Corporate Governance Committee at the time, oversaw the process by which Aghili was appointed to the Graphic Packaging Board in March 2022. Aghili owes his Board position and

the associated compensation to Martens. Thus, Aghili cannot consider a demand to take action against Defendant Martens with the required independence and disinterest.

131. Aghili authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

132. Aghili, as a member of the Audit Committee, had duties regarding oversight of the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's guidelines and policies with respect to risk assessment and risk management. Aghili utterly failed to perform these essential duties.

133. Aghili, as a member of the Compensation and Management Development Committee, had duties to oversee the Company's executive compensation programs and evaluate the performance of its executive officers. Aghili utterly failed to perform these essential duties.

134. Aghili, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Aghili taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

135. Aghili is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Aghili is futile and, thus, excused.

**B.      Demand Upon Defendant Brlas Is Excused**

136. Brlas authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

137. Brlas benefited from the violation of Section 14(a) of the Exchange Act by securing her reelection to the Board through the materially false and misleading statements and material omissions in the 2025 Proxy.

138. Brlas, as a member of the Compensation and Management Development Committee during the misconduct period, had duties to oversee the Company's executive compensation programs and evaluate the performance of its executive officers. Brlas utterly failed to perform these essential duties.

139. Brlas, as a member of the Nominating and Corporate Governance Committee had the duty, among others, to ensure the implementation and effectiveness of Graphic Packaging's Code of Conduct and Governance Guidelines. Brlas utterly failed to perform these duties.

140. Brlas, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate

and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Brlas taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

141. Brlas is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Brlas is futile and, thus, excused.

### C. Demand Upon Defendant Callahan Is Excused

142. Callahan authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

143. Callahan, as a member of the Audit Committee during the misconduct period, had duties regarding oversight of the quality and integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; and the Company's guidelines and policies with respect to risk assessment and risk management. Callahan utterly failed to perform these essential duties.

144. Callahan, as a member of the Compensation and Management Development Committee, had duties to oversee the Company's executive compensation programs and evaluate the performance of its executive officers. Callahan utterly failed to perform these essential duties.

145. Callahan, as Chair of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of Graphic Packaging's Code of Conduct and Governance Guidelines. Callahan utterly failed to perform these duties.

146. Callahan, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial

condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Callahan taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

147.   Callahan is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Callahan is futile and, thus, excused.

### D.   Demand Upon Defendant Hagemann Is Excused

148.   Hagemann authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

149.   Hagemann benefited from the violation of Section 14(a) of the Exchange Act by securing his reelection to the Board through the materially false and misleading statements and material omissions in the 2025 Proxy.

150.   Hagemann, as a member of the Audit Committee, had duties regarding oversight of the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and  the Company's guidelines and policies with respect to risk assessment and risk management.  Hagemann utterly failed to perform these essential duties.

151.   Hagemann, as a member of the Nominating and Corporate Governance Committee during the misconduct period, had the duty, among others, to ensure the implementation and effectiveness of Graphic Packaging's Code of Conduct and Governance Guidelines. Hagemann utterly failed to perform these duties.

152. Hagemann, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Hagemann taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

153. Hagemann is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Hagemann is futile and, thus, excused.

### E.    Demand Upon Defendant Maselli Is Excused

154. Maselli benefited from the violation of Section 14(a) of the Exchange Act by securing his election to the Board through the materially false and misleading statements and material omissions in the 2025 Proxy.

155. Maselli, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the

43

consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Maselli taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

156. Maselli is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Maselli is futile and, thus, excused.

**F.      Demand Upon Defendant Rietbroek Is Excused**

157. Defendant Rietbroek is not independent. Rietbroek serves as the Company's President and CEO. As an employee of Graphic Packaging, he receives his principal occupation and substantial compensation from the Company, including a base salary of $1,350,000. Thus, Rietbroek could not consider a demand for action that might require him to sue the directors who control his continued employment and substantial compensation or fellow members of management with whom he works on a day-to-day basis.

158. Rietbroek, upon assuming the role of President and CEO on January 1, 2026, was required to, but failed to cause the Company to recover the incentive compensation paid to Defendants Doss and Scherger during the misconduct period and the proceeds of Martens' illicit sales of Graphic Packaging stock during the misconduct period. Had Rietbroek taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

159. Rietbroek is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Rietbroek is futile and, thus, excused.

### G.    Demand Upon Defendant Stafeil Is Excused

160.    Defendant Stafeil joined the Board on March 8, 2026.

161.    Stafeil, upon his appointment to the Board, was required to, but failed to cause the Company to recover the incentive compensation paid to Defendants Doss and Scherger during the misconduct period and the proceeds of Martens' illicit sales of Graphic Packaging stock during the misconduct period. Had Stafeil taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

162.    Stafeil faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Stafeil is futile and, thus, excused.

### H.    Demand Upon Defendant Venturelli Is Excused

163.    Venturelli authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

164.    Venturelli, as Chair of the Audit Committee during the misconduct period, bore particular responsibility for oversight of the quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's guidelines and policies with respect to risk assessment and risk management. Venturelli utterly failed to perform these essential duties.

165.    Venturelli, as a member of the Nominating and Corporate Governance Committee during the misconduct period, had the duty, among others, to ensure the implementation and effectiveness of Graphic Packaging's Code of Business Conduct and Ethics and Governance Guidelines. Venturelli utterly failed to perform these duties.

166.    Venturelli, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations

and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Venturelli taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

167.   Venturelli is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Venturelli is futile and, thus, excused.

### I.   Demand Upon Defendant Wentworth Is Excused

168.   Wentworth authorized the 2025 Proxy containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

169.   Wentworth, as Chair of the Compensation and Management Development Committee, had the duty, among others, to oversee the Company's executive compensation programs and evaluate the performance of the Company's executive officers. Wentworth utterly failed to perform these essential duties.

170.   Wentworth, as a member of the Nominating and Corporate Governance Committee throughout the misconduct period, had the duty, among others, to ensure the implementation and effectiveness of Graphic Packaging's Code of Business Conduct and Ethics and Corporate Governance Guidelines. Wentworth utterly failed to perform these duties.

171.   Wentworth, as a director of Graphic Packaging, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was

complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Had Wentworth taken timely action, the damage caused to Graphic Packaging could have been prevented or at least minimized.

172. Wentworth is neither disinterested nor independent and faces a substantial likelihood of liability for the claims asserted herein. Any demand upon Defendant Wentworth is futile and, thus, excused.

### J. Other Factors Demonstrating That Demand Upon The Graphic Packaging Board Is Excused

173. Graphic Packaging has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

174. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged themselves in self-dealing.

175. Publicly traded companies, such as Graphic Packaging, typically carry director and officer liability insurance ("D&O Insurance") from which the Company could potentially recover some or all of its losses. However, such insurance typically has limited coverage for actions within

the scope of this Complaint — particularly where, as here, the insured directors are the very defendants from whom the Company seeks to recover, creating an "insured versus insured" exclusion that forecloses recovery if the directors voluntarily institute suit against themselves. The Board has not even attempted to pursue a recovery of the Company's damages from the D&O carrier.

176.  The acts complained of herein constitute violations of fiduciary duties owed by Graphic Packaging's officers and directors, and these acts are incapable of ratification.

177.  The Board has taken no remedial action in response to the wrongdoing alleged herein: it has not terminated any officer responsible for the misconduct, has not sought to recover the incentive compensation paid to Defendants Doss and Scherger during the misconduct period, has not sought to recover the proceeds of Defendant Martens' insider stock sales, has not appointed a special committee to investigate the wrongdoing, and has not implemented reforms to the Company's internal controls over inventory management. To the contrary, the Board structured Defendant Doss's December 31, 2025 departure as an involuntary termination without cause, entitling Doss to separation benefits under his November 19, 2015 Employment Agreement.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
**Against Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5**

178.  Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

179.  During the relevant period, Defendants Aghili, Brlas, Callahan, Hagemann, Maselli, Venturelli, and Wentworth caused the Company to repurchase its own shares at

artificially inflated prices. The Board authorized a $1.5 billion share repurchase program in April 2025 and caused the Company to execute approximately $150 million in share repurchases under that program while in possession of material, non-public information about the Company's operational failures.

180. At all relevant times, in connection with Graphic Packaging's repurchases of its shares, Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth made, disseminated, or approved false and misleading statements about the Company, omitting material information specified herein, which they knew or deliberately disregarded as false, misleading, or incomplete, intending to deceive, manipulate, or defraud. These false, misleading, or incomplete statements and these Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock. As directors and officers, Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth, were directly responsible for and are liable for all materially false, misleading, or incomplete statements made during the relevant times.

181. Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth violated Section 10(b) of the Exchange Act and Rule 10b-5 by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts necessary to make the statements not misleading, given the circumstances; and/or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of Graphic Packaging common stock.

182. The Company has been damaged as a result of these Defendants' violations of Section 10(b) and Rule 10b-5 by the Company's purchase of its own shares at artificially inflated prices.

183. Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth acted with scienter, either intending to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were known to, or recklessly disregarded by, Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth.

184. Plaintiff brings this claim within two years of discovering the facts constituting the violation and within five years of the violation.

### COUNT TWO
**Against Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Venturelli, Scherger, and Wentworth for Violation of
Section 14(a) of the Exchange Act and SEC Rule 14a-9**

185. Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

186. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Venturelli, Scherger, and Wentworth. The Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

187. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

189. The 2025 Proxy was materially false and misleading because the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2025 Proxy contained materially false and misleading statements concerning the Board and its Committees' oversight over risks to the Company, the Company's corporate governance, and compensation programs.

190.    The misleading information contained in the 2025 Proxy was material to Graphic Packaging shareholders in determining whether to elect Defendants Brlas, Hagemann, and Maselli to the Board and approve executive compensation.

191.    The material misstatements and omissions in the 2025 Proxy damaged the Company.

192.    Plaintiff, on behalf of Graphic Packaging, seeks relief for damages inflicted upon the Company based on the misleading 2025 Proxy in connection with the improper election of Defendants Brlas, Hagemann, and Maselli and the approval of executive compensation.

**COUNT THREE**
**Against All Individual Defendants for Contribution Under**
**Section 21D of the Exchange Act**

193.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

194.    The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under the federal securities laws.

195.    Graphic Packaging is named as a defendant in the Securities Class Action, which alleges and asserts claims arising under the federal securities laws. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Graphic Packaging is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct. The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

196. As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Graphic Packaging's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

197. The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

198. The Individual Defendants have damaged the Company and are liable to the Company for contribution.

**COUNT FOUR**
**Against All Individual Defendants for Breach of Fiduciary Duty**

199. Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

200. Each of the Individual Defendants owed and owes Graphic Packaging and its stockholders fiduciary duties of loyalty, good faith, due care, and candor.

201. The Individual Defendants breached their fiduciary duties by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Graphic Packaging's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects, particularly regarding the alignment of the Company's production with customer demand and the Company's inventory management practices for the consumer packaging operations from which the Company derives substantially all of its revenues; (2) effectively oversee and monitor the material risks facing the Company; and (3)

investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

202.    The Individual Defendants further breached their fiduciary duties to Graphic Packaging by, *inter alia*, making or allowing the dissemination of false and misleading statements and material omissions in public statements and regulatory filings and permitting Defendant Martens to unload shares on the unsuspecting public while he was in possession of material nonpublic information.

203.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Graphic Packaging's affairs and in the use and preservation of its assets.

204.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, Graphic Packaging has suffered and will continue to suffer significant damages, including litigation and settlement costs in the Securities Class Action, reputational harm, loss of shareholder value, and harm to its corporate image and goodwill.

## COUNT FIVE
**Against All Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty**

205.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

206.    Each of the Individual Defendants has acted, either individually or in concert with other Individual Defendants, with knowledge of the primary fiduciary duty breaches committed by other Individual Defendants, has provided substantial assistance in the accomplishment of the breaches, and has acted with knowledge of, or with reckless or grossly negligent disregard for, the fact that the other Individual Defendants were in breach of their fiduciary duties to the Company.

54

207.   In committing the wrongful acts described herein, the Individual Defendants knowingly or recklessly rendered substantial assistance to other Individual Defendants who committed direct breaches of their fiduciary duties to Graphic Packaging, including by failing to maintain adequate internal controls, failing to oversee material risks, issuing false and misleading statements to investors, and causing unlawful share repurchases at artificially inflated prices.

208.   Because the actions described herein constitute a breach of fiduciary duty, and because the Individual Defendants knowingly or recklessly aided and abetted such breaches by rendering substantial assistance, the Individual Defendants are liable as aiders and abettors.

209.   Each of the Individual Defendants aided and abetted the breaches of fiduciary duty by other Individual Defendants with knowledge that they were breaching their own fiduciary duties to Graphic Packaging and its stockholders, and with knowledge that such conduct would cause substantial harm to the Company and its stockholders.

210.   As a direct and proximate result of the Individual Defendants' aiding and abetting of each other's breaches of fiduciary duty, Graphic Packaging has suffered and will continue to suffer significant damages.

## COUNT SIX
### Against the Individual Defendants for Waste of Corporate Assets

211.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

212.   Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, Martens, and Wentworth caused Graphic Packaging to waste its assets by authorizing and causing the Company to repurchase approximately $150 million of its own common stock at artificially inflated prices during the relevant period. The Board authorized the $1.5 billion repurchase program and caused the Company to execute share repurchases, while concealing

material operational failures that, when disclosed, caused the stock price to decline by more than 50%.

213. The Individual Defendants further caused Graphic Packaging to waste its assets by paying excessive compensation to the Individual Defendants while they were breaching their fiduciary duties to the Company.

**COUNT SEVEN**
**Against the Individual Defendants for Unjust Enrichment**

214. Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

215. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Graphic Packaging, as a result of their compensation and director remuneration and the proceeds which they received as a result of their misstatements and material omissions, while breaching fiduciary duties owed to Graphic Packaging.

216. Further, Defendant Martens sold Graphic Packaging stock while in possession of material nonpublic information that artificially inflated the price of Graphic Packaging stock. As a result, Defendant Martens profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

217. Plaintiff, as a stockholder and representative of Graphic Packaging, seeks on behalf of the Company an order of this Court ordering the Individual Defendants to disgorge and furnish restitution to Graphic Packaging of all profits, benefits, and other compensation obtained by them for their wrongful conduct and fiduciary breaches.

218. Plaintiff, on behalf of Graphic Packaging, has no adequate remedy at law.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Graphic Packaging and that Plaintiff is an adequate representative of the Company;

(b) Declaring that Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Maselli, Venturelli, Scherger, and Wentworth violated Section 10(b) of the Exchange Act and the related Rule promulgated thereunder;

(c) Declaring that Defendants Aghili, Brlas, Callahan, Doss, Hagemann, Venturelli, Scherger, and Wentworth violated Section 14(a) of the Exchange Act and the related Rule promulgated thereunder;

(d) Declaring that the Individual Defendants violated Section 21D of the Exchange Act and the related Rules promulgated thereunder;

(e) Declaring that the Individual Defendants have breached and aided and abetted the breach of their fiduciary duties to Graphic Packaging and its stockholders;

(f) Directing the Company to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight;

(g) Determining and awarding to Graphic Packaging the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(h) Ordering Defendant Martens to disgorge and pay to the Company all profits, benefits, and other compensation obtained by his insider trading and breaches of fiduciary duties;

(i) Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of fiduciary duties described herein;

(j) Awarding Graphic Packaging restitution from the Individual Defendants, and each of them;

(k) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', consultants' and experts' fees, costs, and expenses; and

(l) Granting such other and further relief as the Court may deem just and proper.

57

## IX.    JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable

Dated: July 24, 2026                               By:    */s/Mark D. Smilow*
                                                          Mark D. Smilow
                                                          David C. Katz
                                                          **WEISS LAW**
                                                          305 Broadway, 7th Fl.
                                                          New York, NY 10007
                                                          Telephone: (212) 682-3025
                                                          Facsimile: (212) 682-3010
                                                          Email: dkatz@weisslawllp.com
                                                                   msmilow@weisslawllp.com

                                                          Joshua M. Rubin
                                                          4 Brighton Rd., Ste. 204
                                                          Clifton, NJ 07014
                                                          Email: jrubin@weisslawllp.com

                                                          *Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

I, James Wheeler, hereby verify that I have held stock in Graphic Packaging Holding Company (the "Company") since January 8, 2025. As such, I was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint").  I am ready, willing, and able to pursue this stockholder derivative action on behalf of the Company.  I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true.  Having received a copy of the foregoing Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: 07/23/2026

_James Wheeler_
James Wheeler (Jul 23, 2026 09:51:09 EDT)

_____
James Wheeler